# EXHIBIT

# E

\*   \*   \*   \*   \*   \*   \*   \*

                       \*

In the Matter of the Arbitration     \*

        Between     \*

Efrain Rodriguez,     \*

        Grievant     \*

                     \*

        And     \*

                     \*

The Beverage Works NY, Inc.,     \*

and Ricardo Valentin,     \*

        Employer,     \*

\*   \*   \*   \*   \*   \*   \*   \*   \*

BEFORE: Wellington J. Davis, Jr. Panel Arbitrator

APPEARANCES:

    For the Company:   Susan Burns, Esq.

                      Ricardo Valentin

                      Amaury Peralta

                      Jeffery C. Brown

                      Christopher Ustich

                      Stephen DiMario

    For the Grievants:   Jeffrey Maguire, Esq.

                      Jonathan Hill

2

Edwin Pacheco

Efrain Rodriquez

Nicholas V. Jones

Ricardo Valentin

Place of Hearing:    Newark, NJ

Dates of Hearing:    May 6,7, 2015

Date of Award:    July 20, 2015

As the panel arbitrator for the Beverage Works the undersigned was designated by the parties to hear and determine the following issue:

> "Was the overtime allegedly worked by the grievant "suffered or permitted" within the meaning of the collective bargaining agreement or applicable regulations? If so what shall the remedy be?"

## GRIEVANT'S POSITION

The position of the grievant was expressed in the Post Arbitration Brief dated July 2, 2015:

The Grievants, Edwin Pacheco, Jonathan Hill, Samuel Soto, Efrain Rodriguez, Lenny Reyes and Darnell Brunston ("Grievants"), by and through their attorneys, submit this legal brief as a closing statement in support of their arguments made during arbitration concerning violations of the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL"). The Grievants, former delivery drivers belonging to Local 713, IBOTU, IUJAT Union ("Union"), bring this action against Beverage Works, Inc. ("the Beverage Works" or "the Company"), alleging that the Company failed to pay its delivery drivers statutorily-required overtime pay for all hours worked exceeding forty in a given workweek.

During the course of the two-day arbitration, the Grievants each provided independent testimony that they worked as delivery drivers for some length of time during the applicable six year limitations period preceding the filing of the instant

3

action.[1] Although their duration of employment varied, their testimony showed that essentially every other detail of their employment with the Beverage Works was nearly identical. As delivery drivers, each Grievant worked five days per week for approximately twelve hours a day, totaling approximately sixty to sixty-five hours per week. Their daily routines each consisted of arriving at the Company's warehouse before 6:00 a.m., receiving a manifest that listed the location and address of each stop that they needed to make that day, carrying out the delivery of Red Bull to each vendor, and then returning to the warehouse upon completion of their routes. Grievants supported their testimony with documents reflecting that they indeed returned to the Company's warehouse at the end of their routes anywhere from around 5:00 p.m. unti16:30 p.m. The Grievants' testimony about the commencement time of their work day was supported by the Beverage Works' documents that showed warnings issued for failure to be at the warehouse by 6:00 a.m. Grievants further testified and produced documentary evidence that the Company paid them the same amount every week, which the Company calculated based on the Grievants' hourly rates multiplied by forty hours in a given week. Indeed, the evidence produced by the Grievants made it clear that the Beverage Works never paid any delivery drivers overtime hours for the entirety of their employment with the Company.

The Beverage Works does not dispute this. Instead, the Beverage Works bases its entire argument of denying Grievants their overtime pay on the Collective Bargaining Agreement ("CBA"). This argument that the Grievants contracted out of their FLSA protections is inherently flawed, as this dispute is not brought by the Grievants alleging violations of the CBA, but rather whether the Company's pay practices violated the FLSA. Indeed, the law is clear that wage violation disputes may be determined by

---

[1] The Beverage Works argues that some Grievants are "barred by the two year Statute of Limitations under the FLSA." This is not true. Under the FLSA, the applicable Statute of Limitations is three years "if the employer knew that there was an appreciable possibility that it was covered by the Act and failed to take steps reasonably calculated to resolve the doubt." *McLaughlin v. Richland Shoe Co,.*486 U.S. 128, 136 (1988). Further, the Statute of Limitations for Grievants' NYLL claims is six years. *Pineda v. Masonry Const., Inc., 831* F. Supp. 2d 666, 682 (S.D.N.Y. 2011)

4

arbitration, but the law is equally well-settled, long-held law that "FLSA rights cannot be abridged by contract or otherwise waived because it would nullify the purposes of the statute and thwart the legislative policies it was designed to effectuate." *Barrentine* v. *Arkansas-Best Freight Sys., Inc.,* 450 U.S. 728, 740 (1981) (internal quotations omitted); *Brooklyn Savings Bank v. O'Neill,* 324 U.S. 697,707 (1945).

Equally resolved is that an employer may not set a policy to prevent unauthorized overtime ours and then intentionally refuse to pay overtime rates in reliance on that policy. Rather, when an employer knows or has reason to know that overtime hours are being worked, it cannot stand idly by and then refuse to pay its employees the statutorily-required rates. *Forrester* v. *Roth's* 1. G. A. *Foodliner, Inc.,* 646 F.2d 413,414 (9th Cir. 1981). Rather, it must take all measures available to prevent the unwanted overtime work. *Chao* v. *Gotham Registry, Inc.,* 514 F.3d 280, 291 (2d Cir. 2008). The testimony by all parties and the documentary evidence produced shows that the Beverage Workers either knew, or reasonably should have known that the delivery Drivers' routes were taking longer than eight hours in a day.

In efforts to minimize its liability, the Beverage Works attempts to fall back on the argument that Grievants never in fact worked any overtime hours. Grievants, however, meet their burden to draw a reasonable inference that they worked more than forty hours in a given week. Indeed, it is well-settled law that Grievants' estimates of their work hours based on their recollection **alone** is enough to shift the burden to the Company to show that it did in fact pay the Grievants for all hours worked at applicable rates. *Kuebel* v. *Black & Decker Inc.,* 643 F.3d 352, 362 (2d Cir. 2011) (collecting cases). As previously stated and further explained below, Grievants produced evidence to support their testimony that the Company gave them manifests with well over forty stops and produced "recap receipts" that show that they worked well past 6:00 p.m.

5

Accordingly, the burden clearly shifts to the Beverage Works, which has done absolutely nothing to rebut the Grievants' proof. Indeed, the Beverage Works glaringly failed to produce **ANY** documents whatsoever to support its supervisors' testimony that the delivery drivers "rarely" worked more than eight hours in a day. Undoubtedly, if these documents corroborated the testimony of the Beverage Works' supervisors, the Grievants' testimony would have been completely debunked. Obviously, the Beverage Works decided not to produce these documents because they supported the Grievants' testimony. The fact that the Beverage Works chose not to address this glaring hole in its argument both at arbitration and in its closing brief speaks volumes. Hiding its head in the sand does not make this evidentiary problem disappear.

Therefore, the Grievants should succeed in their arbitration dispute.

<u>COMPANY POSITION</u>

The Company's position was expressed in the Post arbitration brief dated June 26, 2013:

UNDISPUTED FINDINGS OF FACT

1.  Grievants are former employees of Beverage Works.

2.  Grievants were delivery representatives (i.e., drivers).

3.  While employed at Beverage Works, Grievants were members of the Local 713, IBOTU, IUJAT Union ("Union"), which is the exclusive bargaining unit for the Former Employees as well as certain other Beverage Works employees.

4.  Grievants' employment was governed by a negotiated agreement between Beverage Works and the Union ("CBA or "Agreement") as well The Beverage Works' Employee Handbook ("Employee Handbook") which is explicitly incorporated into and made a part of the CBA.

5.  The CBA was "bargained collectively" and is mutually agreed "upon terms and conditions of employment under which the ... employees shall work."

6.  The CBA "recognize[s] the unique position of the sales and delivery

6

representative and its independence in performing its responsibilities." The CBA provides that sales and delivery representatives are salaried employees and that they shall be paid for completing their assigned route, which route is designed to be completed in an eight (8) hour day.

7. The minimum starting salary for a delivery representative is $25,000.00 and drivers also receive a bonus based upon the amount of product they deliver. (CBA and testimony of Jeffrey Brown)

8. The CBA further requires that if a route is taking more or less time to complete, "the employee will notify his supervisor and the supervisor, upon confirming the length of time will adjust the route up or down to ensure the route can be completed in eight (8) hours."

9. In addition, the CBA specifically incorporates the Employee Handbook into the CBA. The Handbook specifically requires drivers to notify Beverage Works **in writing** if his or her route takes more than eight (8) hours a day to complete.

10. Grievants' acknowledged receipt of the Employee Handbook in writing. (Grievants' testimony)

11. None of the Grievants' complained in writing to Beverage Works that their routes were taking more or less than eight (8) hours per day. (Grievants testimony)

12. Each Grievant admitted and that they never grieved the amount of time it took to complete their route or the compensation they received through their Union. (Grievants' testimony)

13. The Union has never brought an action alleging the Grievants were working more than forty hours a week or were not compensated for all hours worked. (Undisputed Testimony of Beverage Works)

14. Chris Ustick, the Vice President of Sales, attended monthly meetings with the Union and the issue of drivers working in excess of eight (8) hours per day was never raised by the Union. (Undisputed testimony of Chris Ustick)

15. Mr. DiMario was initially employed as a driver and always completed his route within eight (8) hours, often completing forty to fifty stops on any given day. (Unrefuted testimony of Mr. DiMario)

16. Beverage Works has a sophisticated computer system which delivery stops are inputted into and a route is formulated. The list of stops appear in the suggested

7

order that the deliveries should be completed as it is the most geographically efficient. However drivers are fee to deviate if they believe that there is a more efficient manner of completing the deliveries. (Unrefuted testimony of Ricardo Valentin)

17. Beverage Works receives orders for products from its sales force on a daily basis. Each day after the orders are entered, an individualized route is designed for each driver. Drivers are given deliveries in their assigned area. (Unrefuted testimony of Steve DiMario, Ricardo Valentin and Amaury Peralta)

18. Each route is designed on an individual basis taking into account a variety of considerations such as anticipated traffic conditions, type of entities the deliveries are going to, and is designed to be completed in eight (8) hours. (Unrefuted testimony of Jeffrey Brown, Steve DiMario, Ricardo Valentin and Amaury Peralta)

19. Each and every day the Beverage Works Operations Manager reviews the orders for a specific area and adjust routes up or down to insure that they can be completed in eight (8) hours. (Unrefuted testimony of Steve DiMario, Ricardo Valentin and Amaury Peralta)

20. On heavier days Beverage Works utilizes swing drivers to lighten routes and also assigns some drivers helpers to ensure that everyone works an eight (8) hour day. (Unrefuted testimony of Steve DiMario and Ricardo Valentin)

21. Beverage Works did not dictate the amount of time that Grievants could take for breaks, preclude stops by the Grievants for personal business, or monitor any deviations from completing the work during the course of the day. (Beverage Works representation and Grievants' testimony)

22. Each of the drivers that currently perform the routes held by the Grievants have given a sworn Affidavit stating that the route does not take more than eight (8) hours per day and he is aware that if there is a problem with the route, he is to report it to his supervisor. (Affidavits)

23. Grievant Hill complained that his route was too light. (Unrefuted testimony of Steve DiMario and Mr. Hill)

24. The time period in which Beverage Works sought to have Grievants back was approximately 1:00 p.m. (Unrefuted testimony of Steve DiMario)

25. It would be problematic if beverage Works drivers were coming back at 4:00 and 5:00 in the afternoon, because it would negatively impact on the next day. The

8

goal is to have drivers back by 1:00 p.m. to start getting ready for the next day's deliveries. Beverage Works would want to see what deliveries were not completed (pushed) and needed to be re-routed the next day. The Operations Manager would want to begin formulating the routes based upon the current orders and the pushed deliveries. In addition, Beverage Works would want to begin unloading and loading the trucks for the next day. (Unrefuted testimony of Ricardo Valentin and Steve DiMario)

All of the foregoing, is undisputed on this record. Here there is no question that Beverage Works NY, Inc., fully complied with the express and negotiated terms of the Collective Bargaining Agreement ("CBA") and has fully compensated each of the Grievants in accordance with the provisions of the Collective Bargaining Agreement and all applicable laws.

A hearing was held on May 7, 2015 in the offices of the New Jersey State Board of Mediation located at Two gateway Center Newark, NJ.  At this time the parties were afforded full opportunity to present witnesses, documentary evidence and oral arguments in support of their respective positions. The parties requested to submit closing briefs on the other Grievants and upon receipt of same the hearings were closed on June 26, 2015.

DISCUSSION AND AWARD

As the moving party the burden of proof is on the grievant to satisfy the undersigned that Efrain Rodriguez is entitled to the $91,960.00 in unpaid overtime and liquidated damages as claimed. In the opinion of the undersigned this burden has not been met. His basic contention was that from April 30, 2012 until January 2013 he worked at least 12 hours a day. This testimony was found to be incredible. For an employee working in a union environment who by his own testimony was hired to work at the most 40 hours a week for a specific amount of money would just accept these ridiculous working hours (67.5) as a given is hard to swallow.

Mr. Rodriguez testified that he joined the Company April 2012 as a salaried worker in

9

the capacity of a delivery person. As such he acknowledged he was informed that his route should be completed within 8 hours and he was informed of what steps to take if the route was too long. He reviewed a manifest of Mr. Hill indicating he had covered it while he was out and it also represented a typical number of stops on the manifests he received.

Again he recited the mantra of his coworkers that the routes always exceeded 8 hours as he started between 5:30 – 6:00am and finished between 5:00 – 6:00pm. He also would be "ordered" to finish the route upon calling in when he hadn't finished and it was close to 8 hours. He claims his supervisors would often tell him, "You've only got a few more stops..." A few more stops would not bring you to 5:00 or 6:00pm.

Under cross examination he was challenged on his testimony that he returned to the Company between 5:00 and 6:00pm every day. When asked by the Company Advocate, "Did you ever come back at 1:40pm?"he replied, "Early on when I had a very small route BK3 ". During redirect he testified that he was on this route 3 months! Even at this point there was no effort to correct the claim.

After the Company opened the door to the subject of commissions the Grievant's attorney attempted to evoke from the grievant that perhaps the commissions contributed to his willingness to work the extra hours. When asked, "Do you believe that the commissions received incentivized you to work more hours and complete your routes each week?" his answer was, "No." A positive response to this question may have given pause to the undersigned as to the persistent quandary as to why a union employee hired to work 40 hours would constantly work an additional 20 to 35 hours a week with no grievance. I repeat it doesn't make sense. If it doesn't make sense it's not true. In part the grievant in his own testimony proved his premise to be faulty.

The grievant's representative suggests that a Company "cannot stand idly by..."[2] and ", it must take all measures available to prevent the unwanted overtime work."[3] Clearly the Company did not stand idly by and in fact required employees to put in writing if a

---

[2] Grievants' Post Arbitration Brief pg 2
[3] Grievant's Post arbitration Brief pg 2

10

route took too long[4] but that was clearly a CYA. As a point of fact through credible testimony of several Company witnesses the process of adjusting routes to be completed within 8 hours was explained with the recognition that it was in the Company's best interest to have the drivers back by 2:00pm and that in many cases they came in as early as 12:30pm. Any adjustments required were effected the next day.

Christopher Ustich, Vice President, testified that the Company did not closely monitor the drivers on their routes to determine how much personal time is taken including breaks and lunch and as a result depended on driver feedback to insure the routes were finished within 8 hours. He indicated that in his position he attended meetings at least bimonthly with the Union and problems with route completion within the allotted time were never raised. He pointed out that the Company has a complaint box and he has an open door policy in addition to attending driver and team meetings on a regular basis any of which could be used to challenge route length. According to him prior to this law suit there had been no unresolved issues with excessive route stops.

Steven DiMario, Operations Director, an eleven year employee of the Company, testified that he formulated the routes on a daily basis from 2011 - 2013. He explained that they were formulated on an individual basis using various factors such as case load, stop amount and driver efficiency. He credibly testified that as issues were raised he would adjust the routes the next day. He described how on occasion he would lighten a route for vacation or personal reasons. He indicated that the Company employed swing drivers and helpers to assist the regular drivers who were experiencing difficulty.

He mentioned that he had occasion to attend drivers meeting but never encountered any hue and cry over route completion. When issues were raised the routes were tweaked before the next day. He confirmed that the Company did not monitor the drivers. He added that when he was in Brooklyn he physically observed most drivers were back by 2:00pm and it was not unusual on a Monday that most were back by

---

[4] Pg 16 Beverage Works Handbook dated 2011

11

12:30pm.

Jeff Brown, V.P. Operations, testified that he has been with the Company for 13 years and started out as a Driver receiving a salary. When asked did he complete his routes in 8 hours he responded, "No... 6 hours." He rebutted the suggestion of the grievant's attorney that the language in the Employee Handbook[5] regarding overtime applied to the drivers and confirmed that it only applied to hourly employees. He confirmed the responsibility of the driver to report route problems in order to have the routes finished within 8 hours. He indicated that the new UPS program utilized by the Company is extremely efficient in setting up routes.

Amaury Peralta, Sales Manager, and Company employee for 12 years also testified that he had been a Driver/Seller before his current position and always completed his routes in 8 hours or less. He described his familiarity with the routes and added he provided daily feedback to the routers including Steve DiMario in order to tweak routes when required. He indicated that he followed up with whoever brought the issue to his attention. He credibly testified that when contacted by a driver he would review the stops and advise him accordingly. He might indicate which stops to complete and or push for delivery next day. He indicated that the divers for the most part would return between 1 and 2pm.

He recounted occasions during the driver meetings when the issue of route length was raised. He claimed to have met with the driver after to discuss the issue and coordinated with Steve or the individual routing and tweak it immediately. Occasionally a helper would be provided which would allow delivery in difficult parking areas (the truck could keep circling or double park) as well as help unloading cases. He rebutted the Grievants' claim that supervisors including him were readily available to insure customer satisfaction.

The final witness for the Company was Ricardo Valentin, Operations Manager. He indicated that prior to taking that position he had been employed as a driver and

---

[5] Beverage Works Employee Handbook IX pg 12 pg 12

12

completed his rotes in 8 hours or less. He stated the Company now used a sophisticated routing program developed by UPS but this did not result in any major differences in route compilation. The factors used paralleled the other Operations Manager in that he took into consideration traffic, accounts and the driver. He confirmed all previous testimony that route concerns were addressed immediately when possible and no later than the next day if necessary. The Company through this witness offered into evidence affidavits of the current drivers performing the grievant's route. The affidavits were accepted "For what they are worth." based on the Best Evidence objection of the Grievant's counsel.  As appoint of fact the undersigned gave little consideration to these documents in that several of the Company's earlier witnesses including Mr. Peralta established that they had completed their routes in 8 hours or less.

After weighing all the evidence and testimony the undersigned finds that the Grievant did not meet the burden of proof that he worked approximately 25 to 30 hours per week for his entire employment at the Company. There was also unrebutted testimony that Monday was "light day" and most drivers were in by 12:30pm

It does not make sense that a prudent person working in a union environment would agree to work 60 to 70 hours per week for the same amount paid for 40 hours per week. If it doesn't make sense it is not true. The Company had a system in place that worked for the Company official that had worked as drivers. In the instant grievance although claiming to have worked every single day to 6:00 or 7:00pm by his own testimony admitted during his first three months of employment he was back between 1:00 – 2:00pm. The testimony of the grievant is totally unreliable.

For the above mentioned reasons this grievance is denied in its entirety.

Wellington J. Davis, Jr.

On this 25th day of July 2015,

13

before me personally appeared    *Wellington J. Davis Jr.* known to

be the individual described in and who executed the foregoing instrument, and he

acknowledged to me that he/she executed same

STATE OF NEW JERSEY

COUNTY OF MONMOUTH

SIGNATURE OF NOTARY    *Patricia Davis*

MY COMMISION EXPIRES

PATRICIA DAVIS
ID # 2286732
NOTARY PUBLIC
STATE OF NEW JERSEY
My Commission Expires April 18, 2017

# EXHIBIT

# F

```
*    *    *    *    *    *    *    *

                                    *

In the Matter of the Arbitration    *

        Between                     *

Jonathan Hill,                      *

            Grievant                *

                                    *

        And                         *

                                    *

The Beverage Works NY, Inc.,        *

and Ricardo Valentin,               *

            Employer,               *

*    *    *    *    *    *    *    *    *
```

BEFORE: Wellington J. Davis, Jr. Panel Arbitrator

APPEARANCES:

      For the Company:  Susan Burns, Esq.

                      Ricardo Valentin

                      Amaury Peralta

                      Jeffery C. Brown

                      Christopher Ustich

                      Stephen DiMario

      For the Grievants:  Jeffrey Maguire, Esq.

                      Jonathan Hill

2

Edwin Pacheco

Efrain Rodriquez

Nicholas V. Jones

Ricardo Valentin

Place of Hearing:    Newark, NJ

Dates of Hearing:    May 7, 2015

Date of Award:    July 22, 2015

As the panel arbitrator for the Beverage Works the undersigned was designated by the parties to hear and determine the following issue:

> "Was the overtime allegedly worked by the grievant "suffered or permitted" within the meaning of the collective bargaining agreement or applicable regulations? If so what shall the remedy be?"

A hearing was held on May 7, 2015 in the offices of the New Jersey State Board of Mediation located at Two gateway Center Newark, NJ. At this time the parties were afforded full opportunity to present witnesses, documentary evidence and oral arguments in support of their respective positions. The parties requested to submit closing briefs on the other Grievants and upon receipt of same the hearings were closed on June 26, 2015.

A hearing was held on March 6, 2015 in the offices of the New Jersey State Board of Mediation located at Two gateway Center Newark, NJ. At this time the parties were afforded full opportunity to present witnesses, documentary evidence and oral arguments in support of their respective positions. The parties requested to submit closing briefs on the other Grievants and upon receipt of same the hearings were closed on June 26, 2015.

GRIEVANT'S POSITION

The position of the grievant was expressed in the Post Arbitration Brief dated July 2, 2015:

3

The Grievants, Edwin Pacheco, Jonathan Hill, Samuel Soto, Efrain Rodriguez, Lenny Reyes and Darnell Brunston ("Grievants"), by and through their attorneys, submit this legal brief as a closing statement in support of their arguments made during arbitration concerning violations of the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL"). The Grievants, former delivery drivers belonging to Local 713, IBOTU, IUJAT Union ("Union"), bring this action against Beverage Works, Inc. ("the Beverage Works" or "the Company"), alleging that the Company failed to pay its delivery drivers statutorily-required overtime pay for all hours worked exceeding forty in a given workweek.

During the course of the two-day arbitration, the Grievants each provided independent testimony that they worked as delivery drivers for some length of time during the applicable six year limitations period preceding the filing of the instant action.[1] Although their duration of employment varied, their testimony showed that essentially every other detail of their employment with the Beverage Works was nearly identical. As delivery drivers, each Grievant worked five days per week for approximately twelve hours a day, totaling approximately sixty to sixty-five hours per week. Their daily routines each consisted of arriving at the Company's warehouse before 6:00 a.m., receiving a manifest that listed the location and address of each stop that they needed to make that day, carrying out the delivery of Red Bull to each vendor, and then returning to the warehouse upon completion of their routes. Grievants supported their testimony with documents reflecting that they indeed returned to the Company's warehouse at the end of their routes anywhere from around 5:00 p.m. unti16:30 p.m. The Grievants' testimony about the commencement time of their work day was supported by the Beverage Works' documents that showed warnings issued for failure to be at the warehouse by 6:00 a.m. Grievants further testified and produced

---

[1] The Beverage Works argues that some Grievants are "barred by the two year Statute of Limitations under the FLSA." This is not true. Under the FLSA, the applicable Statute of Limitations is three years "if the employer knew that there was an appreciable possibility that it was covered by the Act and failed to take steps reasonably calculated to resolve the doubt." *McLaughlin v. Richland Shoe Co,.*486 U.S. 128, 136 (1988). Further, the Statute of Limitations for Grievants' NYLL claims is six years. *Pineda v. Masonry Const., Inc., 831* F. Supp. 2d 666, 682 (S.D.N.Y. 2011)

4

documentary evidence that the Company paid them the same amount every week, which the Company calculated based on the Grievants' hourly rates multiplied by forty hours in a given week. Indeed, the evidence produced by the Grievants made it clear that the Beverage Works never paid any delivery drivers overtime hours for the entirety of their employment with the Company.

The Beverage Works does not dispute this. Instead, the Beverage Works bases its entire argument of denying Grievants their overtime pay on the Collective Bargaining Agreement ("CBA"). This argument that the Grievants contracted out of their FLSA protections is inherently flawed, as this dispute is not brought by the Grievants alleging violations of the CBA, but rather whether the Company's pay practices violated the FLSA. Indeed, the law is clear that wage violation disputes may be determined by arbitration, but the law is equally well-settled, long-held law that "FLSA rights cannot be abridged by contract or otherwise waived because it would nullify the purposes of the statute and thwart the legislative policies it was designed to effectuate." *Barrentine* v. *Arkansas-Best Freight Sys., Inc.,* 450 U.S. 728, 740 (1981) (internal quotations omitted); *Brooklyn Savings Bank v. O'Neill,* 324 U.S. 697,707 (1945).

Equally resolved is that an employer may not set a policy to prevent unauthorized overtime ours and then intentionally refuse to pay overtime rates in reliance on that policy. Rather, when an employer knows or has reason to know that overtime hours are being worked, it cannot stand idly by and then refuse to pay its employees the statutorily-required rates. *Forrester v. Roth's 1. G. A. Foodliner, Inc.,* 646 F.2d 413,414 (9th Cir. 1981). Rather, it must take all measures available to prevent the unwanted overtime work. *Chao* v. *Gotham Registry, Inc.,* 514 F.3d 280, 291 (2d Cir. 2008). The testimony by all parties and the documentary evidence produced shows that the Beverage Workers either knew, or reasonably should have known that the delivery Drivers' routes were taking longer than eight hours in a day.

In efforts to minimize its liability, the Beverage Works attempts to fall back on the

5

argument that Grievants never in fact worked any overtime hours. Grievants, however, meet their burden to draw a reasonable inference that they worked more than forty hours in a given week. Indeed, it is well-settled law that Grievants' estimates of their work hours based on their recollection **alone** is enough to shift the burden to the Company to show that it did in fact pay the Grievants for all hours worked at applicable rates. *Kuebel* v. *Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011) (collecting cases). As previously stated and further explained below, Grievants produced evidence to support their testimony that the Company gave them manifests with well over forty stops and produced "recap receipts" that show that they worked well past 6:00 p.m.

Accordingly, the burden clearly shifts to the Beverage Works, which has done absolutely nothing to rebut the Grievants' proof. Indeed, the Beverage Works glaringly failed to produce **ANY** documents whatsoever to support its supervisors' testimony that the delivery drivers "rarely" worked more than eight hours in a day. Undoubtedly, if these documents corroborated the testimony of the Beverage Works' supervisors, the Grievants' testimony would have been completely debunked. Obviously, the Beverage Works decided not to produce these documents because they supported the Grievants' testimony. The fact that the Beverage Works chose not to address this glaring hole in its argument both at arbitration and in its closing brief speaks volumes. Hiding its head in the sand does not make this evidentiary problem disappear.

Therefore, the Grievants should succeed in their arbitration dispute.

COMPANY POSITION

The Company's position was expressed in the Post arbitration brief dated June 26, 2013:

UNDISPUTED FINDINGS OF FACT

1.    Grievants are former employees of Beverage Works.

2.    Grievants were delivery representatives (i.e., drivers).

6

3. While employed at Beverage Works, Grievants were members of the Local 713, IBOTU, IUJAT Union ("Union"), which is the exclusive bargaining unit for the Former Employees as well as certain other Beverage Works employees.

4. Grievants' employment was governed by a negotiated agreement between Beverage Works and the Union ("eBA or "Agreement") as well The Beverage Works' Employee Handbook ("Employee Handbook") which is explicitly incorporated into and made a part of the CBA.

5. The CBA was "bargained collectively" and is mutually agreed "upon terms and conditions of employment under which the ... employees shall work."

6. The CBA "recognize[s] the unique position of the sales and delivery representative and its independence in performing its responsibilities." The CBA provides that sales and delivery representatives are salaried employees and that they shall be paid for completing their assigned route, which route is designed to be completed in an eight (8) hour day.

7. The minimum starting salary for a delivery representative is $25,000.00 and drivers also receive a bonus based upon the amount of product they deliver. (CBA and testimony of Jeffrey Brown)

8. The CBA further requires that if a route is taking more or less time to complete, "the employee will notify his supervisor and the supervisor, upon confirming the length of time will adjust the route up or down to ensure the route can be completed in eight (8) hours."

9. In addition, the CBA specifically incorporates the Employee Handbook into the CBA. The Handbook specifically requires drivers to notify Beverage Works **in writing** if his or her route takes more than eight (8) hours a day to complete.

10. Grievants' acknowledged receipt of the Employee Handbook in writing. (Grievants' testimony)

11. None of the Grievants' complained in writing to Beverage Works that their routes were taking more or less than eight (8) hours per day. (Grievants testimony)

12. Each Grievant admitted and that they never grieved the amount of time it took to complete their route or the compensation they received through their Union.

7

(Grievants' testimony)

13. The Union has never brought an action alleging the Grievants were working more than forty hours a week or were not compensated for all hours worked. (Undisputed Testimony of Beverage Works)

14. Chris Ustick, the Vice President of Sales, attended monthly meetings with the Union and the issue of drivers working in excess of eight (8) hours per day was never raised by the Union. (Undisputed testimony of Chris Ustick)

15. Mr. DiMario was initially employed as a driver and always completed his route within eight (8) hours, often completing forty to fifty stops on any given day. (Unrefuted testimony of Mr. DiMario)

16. Beverage Works has a sophisticated computer system which delivery stops are inputted into and a route is formulated. The list of stops appear in the suggested order that the deliveries should be completed as it is the most geographically efficient. However drivers are fee to deviate if they believe that there is a more efficient manner of completing the deliveries. (Unrefuted testimony of Ricardo Valentin)

17. Beverage Works receives orders for products from its sales force on a daily basis. Each day after the orders are entered, an individualized route is designed for each driver. Drivers are given deliveries in their assigned area. (Unrefuted testimony of Steve DiMario, Ricardo Valentin and Amaury Peralta)

18. Each route is designed on an individual basis taking into account a variety of considerations such as anticipated traffic conditions, type of entities the deliveries are going to, and is designed to be completed in eight (8) hours. (Unrefuted testimony of Jeffrey Brown, Steve DiMario, Ricardo Valentin and Amaury Peralta)

19. Each and every day the Beverage Works Operations Manager reviews the orders for a specific area and adjust routes up or down to insure that they can be completed in eight (8) hours. (Unrefuted testimony of Steve DiMario, Ricardo Valentin and Amaury Peralta)

20. On heavier days Beverage Works utilizes swing drivers to lighten routes and also assigns some drivers helpers to ensure that everyone works an eight (8) hour day. (Unrefuted testimony of Steve DiMario and Ricardo Valentin)

21. Beverage Works did not dictate the amount of time that Grievants could take for breaks, preclude stops by the Grievants for personal business, or monitor any

8

deviations from completing the work during the course of the day. (Beverage Works representation and Grievants' testimony)

22. Each of the drivers that currently perform the routes held by the Grievants have given a sworn Affidavit stating that the route does not take more than eight (8) hours per day and he is aware that if there is a problem with the route, he is to report it to his supervisor. (Affidavits)

23. Grievant Hill complained that his route was too light. (Unrefuted testimony of Steve DiMario and Mr. Hill)

24. The time period in which Beverage Works sought to have Grievants back was approximately 1 :00 p.m. (Unrefuted testimony of Steve DiMario)

25. It would be problematic if beverage Works drivers were coming back at 4:00 and 5:00 in the afternoon, because it would negatively impact on the next day. The goal is to have drivers back by 1:00 p.m. to start getting ready for the next day's deliveries. Beverage Works would want to see what deliveries were not completed (pushed) and needed to be re-routed the next day. The Operations Manager would want to begin formulating the routes based upon the current orders and the pushed deliveries. In addition, Beverage Works would want to begin unloading and loading the trucks for the next day. (Unrefuted testimony of Ricardo Valentin and Steve DiMario)

All of the foregoing is undisputed on this record. Here there is no question that Beverage Works NY, Inc., fully complied with the express and negotiated terms of the Collective Bargaining Agreement ("CBA") and has fully compensated each of the Grievants in accordance with the provisions of the Collective Bargaining Agreement and all applicable laws.

DISCUSSION AND AWARD

As the moving party the burden of proof is on the grievant to satisfy the allegation that Jonathan Hill is entitled to $186,500.00 in unpaid overtime and liquidated damages as claimed. In the opinion of the undersigned this burden has not been met. His basic contention was that from May 6, 2010 until May 9, 2014 he worked at least 12 hours a day. This testimony was found to be incredible. For an employee working in a union

9

environment who by his own testimony was hired to work at the most 40 hours a week for a specific amount of money would just accept these ridiculous working hours (61.25)[2] as a given is hard to swallow.

Mr. Hill testified that he joined the Company May 6, 2010 as a salaried delivery person. In an attempt to circumvent the union aspect of this case he claims he never paid dues. Needless to say even if he did not pay dues he was still covered by the union as the union unwittingly did not seek his removal for nonpayment of dues. For all intents and purposes he could have filed a grievance with the Union (perhaps he didn't want to rock the boat as he was not paying dues). As a matter of fact under cross examination he admitted approaching the shop steward but received no satisfaction. In other words although hired to work 40 hours per week in a union protected job he claims to have worked up to almost twice the hours for the same weekly salary. It does not make sense and if it doesn't make sense it is not true.

During direct testimony after stating he must complete all the stops on his manifest he later indicated that there was a protocol for "pushing" stops that could not be delivered. When asked by counsel, "Did he routinely exceed 8 hours?", he responded "maybe of four or 5 days per week." This again detracts from the credulity of the claim for every day worked.

When asked under cross, "Was your route ever adjusted by Ricardo (to meet the 8 hour finish time)?", he responded, "A few times." He also admitted that he would call from the road when he was getting close to eight hours. Why call if you were required to complete the manifest? To the question, "Is it your testimony that you never got back between 12:00 and 1:00pm after completing a route?" Without hesitation he responded, "A handful of times." That doesn't comport with every day between 5:00 and 6:00 pm. Here again inconsistencies like this make it easy to disregard the entire claim.

During redirect Mr. Hill produced a Strip slip[3] with a time and date stamp of 06/12/13

---

[2] Statement of Damages Jonathan Hill
[3] Grievant Hill 3

10

4:46pm. It was agreed that the official version contains a supervisor and worker signature but that this copy is retained by the employee. Mr. Hill indicated that he received a copy every time he returned. The Grievant's advocate asks why the Company didn't bring copies to contradict the claims of the Grievants. As the finder of facts my question is recognizing you have the burden of proof why bring only one out of a possible 1040 which would wipe away any doubt.

Mr. Hill did not contract away his right to overtime but rather accepted a position identified in the cba as salaried. There was no evidence or testimony offered to suggest that salaried employees cannot be covered by a collective bargaining agreement.

The grievant's representative suggests that a Company "cannot stand idly by..."[4] and ", it must take all measures available to prevent the unwanted overtime work."[5] Clearly the Company did not stand idly by and in fact required employees to put in writing if a route took too long[6] but that was clearly a CYA. As a point of fact through credible testimony of several Company witnesses the process of adjusting routes to be completed within 8 hours was explained with the recognition that it was in the Company's best interest to have the drivers back by 2:00pm and that in many cases they came in as early as 12:30pm. Any adjustments required were effected the next day.

Christopher Ustich, Vice President, testified that the Company did not closely monitor the drivers on their routes to determine how much personal time is taken including breaks and lunch and as a result depended on driver feedback to insure the routes were finished within 8 hours. He indicated that in his position he attended meetings at least bimonthly with the Union and problems with route completion within the allotted time were never raised. He pointed out that the Company has a complaint box and he has an open door policy in addition to attending driver and team meetings on a regular basis any of which could be used to challenge route length. According to him prior to this law suit there had been no unresolved issues with excessive route stops.

---

[4] Grievants' Post Arbitration Brief pg 2
[5] Grievant's Post arbitration Brief pg 2
[6] Pg 16 Beverage Works Handbook dated 2011

11

Steven DiMario, Operations Director, an eleven year employee of the Company, testified that he formulated the routes on a daily basis from 2011 - 2013. He explained that they were formulated on an individual basis using various factors such as case load, stop amount and driver efficiency. He credibly testified that as issues were raised he would adjust the routes the next day. He described how on occasion he would lighten a route for vacation or personal reasons. He remembers Mr. Hill requesting a longer route for personal reasons and later requesting his route be reduced. He indicated that the Company employed swing drivers and helpers to assist the regular drivers who were experiencing difficulty.

He mentioned that he had occasion to attend drivers meeting but never encountered any hue and cry over route completion. When issues were raised the routes were tweaked before the next day. He confirmed that the Company did not monitor the drivers. He added that when he was in Brooklyn he physically observed most drivers were back by 2:00pm and it was not unusual on a Monday that most were back by 12:30pm.

Jeff Brown, V.P. Operations, testified that he has been with the Company for 13 years and started out as a Driver receiving a salary. When asked did he complete his routes in 8 hours he responded, "No.. 6 hours." He rebutted the suggestion of the grievant's attorney that the language in the Employee Handbook[7] regarding overtime applied to the drivers and confirmed that it only applied to hourly employees. He confirmed the responsibility of the driver to report route problems in order to have the routes finished within 8 hours. He indicated that the new UPS program utilized by the Company is extremely efficient in setting up routes.

Amaury Peralta, Sales Manager, and Company employee for 12 years also testified that he had been a Driver/Seller before his current position and always completed his routes in 8 hours or less. He described his familiarity with the routes and added he provided daily feedback to the routers including Steve DiMario in order to tweak routes when

---

[7] Beverage Works Employee Handbook IX pg 12 pg 12

12

required. He indicated that he followed up with whoever brought the issue to his attention. He credibly testified that when contacted by a driver he would review the stops and advise him accordingly. He might indicate which stops to complete and or push for delivery next day. He indicated that the divers for the most part would return between 1 and 2pm.

He recounted occasions during the driver meetings when the issue of route length was raised. He claimed to have met with the drivers after to discuss the issue and coordinated with Steve or the individual routing and tweak it immediately. Occasionally a helper would be provided which would allow delivery in difficult parking areas (the truck could keep circling or double park) as well as help unloading cases.  He rebutted the Grievants' claim that supervisors including him were not readily available.

He specifically recalls addressing two specific instances with Mr. Hill once to have his route extended and another time to have it shortened.  He coordinated with Steve DiMario to tweak the route and followed up to insure it was resolved. This testimony went unrebutted.

The final witness for the Company was Ricardo Valentin, Operations Manager. He indicated that prior to taking that position had been employed as a driver and completed his rotes in 8 hours or less. He stated the Company now used a sophisticated routing program developed by UPS but this did not result in any major differences in route compilation. The factors used paralleled the other Operations Manager in that he took into consideration traffic, accounts and the driver. He confirmed all previous testimony that route concerns were addressed immediately when possible and no later than the next day if necessary. The Company through this witness offered into evidence affidavits of the current drivers performing the grievant's route. The affidavits were accepted "For what they are worth." ,based on the Best Evidence objection of the Grievant's counsel.  As appoint of fact the undersigned gave little consideration to these documents in that several of the Company's earlier witnesses including Mr. Peralta established that they had completed their routes in 8 hours or less.

13

After weighing all the evidence and testimony the undersigned finds that the Grievant did not meet the burden of proof that he worked approximately 25 to 30 hours per week above and beyond his 40 hour work week for his entire employment at the Company. There was unrebutted testimony that Mr. Hill's route was adjusted on at least two occasions. There was also unrebutted testimony that Monday was "light day" and most drivers were in by 12:30pm which even Mr. Hill admitted that this might happen a "handful of times".

It does not make sense that a prudent person working in a union environment would agree to work 60 to 70 hours per week for the same amount paid for 40 hours per week. If it doesn't make sense it is not true. The Company had a system in place which worked for the Company officials that had been drivers. In the instant grievance although claiming to have worked every single day to 5:00 or 6:00pm there was sufficient inconsistency on behalf of the grievant that rendered the supportive testimony of the grievant unreliable.

For the above mentioned reasons this grievance is denied in its entirety.

Wellington J. Davis, Jr.

On this 25th day of July 2015,

before me personally appeared Wellington J. Davis, Jr. known to

be the individual described in and who executed the foregoing instrument, and he

acknowledged to me that he/she executed same

14

STATE OF NEW JERSEY

COUNTY OF MONMOUTH

SIGNATURE OF NOTARY    *Patricia Davis*

MY COMMISION EXPIRES

PATRICIA DAVIS
ID # 2286732
NOTARY PUBLIC
STATE OF NEW JERSEY
My Commission Expires April 18, 2017

# EXHIBIT

# G

```
*    *    *    *    *    *    *    *

                                    *

In the Matter of the Arbitration    *

          Between                   *

Samuel Torres-Soto,                 *

          Grievant                  *

                                    *

          And                       *

                                    *

The Beverage Works NY, Inc.,        *

and Ricardo Valentin,               *

          Employer,                 *

*    *    *    *    *    *    *    *    *
```

BEFORE: Wellington J. Davis, Jr. Panel Arbitrator

APPEARANCES:

     For the Company:  Susan Burns, Esq.

                       Ricardo Valentin

                       Amaury Peralta

                       Jeffery C. Brown

                       Christopher Ustich

                       Stephen DiMario

     For the Grievants:  Jeffrey Maguire, Esq.

                       Jonathan Hill

2

Edwin Pacheco

Efrain Rodriquez

Nicholas V. Jones

Ricardo Valentin

Darnell Brunsten

Place of Hearing:    Newark, NJ

Dates of Hearing:    May 7, 2015

Date of Award:    July 21, 2015

As the panel arbitrator for the Beverage Works the undersigned was designated by the parties to hear and determine the following issue:

"Was the overtime allegedly worked by the grievant "suffered or permitted" within the meaning of the collective bargaining agreement or applicable regulations? If so what shall the remedy be?"

A hearing was held on May 7, 2015 in the offices of the New Jersey State Board of Mediation located at Two gateway Center Newark, NJ.  At this time the parties were afforded full opportunity to present witnesses, documentary evidence and oral arguments in support of their respective positions. The parties requested to submit closing briefs on the other Grievants and upon receipt of same the hearings were closed on June 26, 2015.

GRIEVANT'S POSITION

The position of the grievant was expressed in the Post Arbitration Brief dated July 2, 2015:

The Grievants, Edwin Pacheco, Jonathan Hill, Samuel Soto, Efrain Rodriguez, Lenny Reyes and Darnell Brunston ("Grievants"), by and through their attorneys, submit this legal brief as a closing statement in support of their arguments made during arbitration

3

concerning violations of the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL"). The Grievants, former delivery drivers belonging to Local 713, IBOTU, IUJAT Union ("Union"), bring this action against Beverage Works, Inc. ("the Beverage Works" or "the Company"), alleging that the Company failed to pay its delivery drivers statutorily-required overtime pay for all hours worked exceeding forty in a given workweek.

During the course of the two-day arbitration, the Grievants each provided independent testimony that they worked as delivery drivers for some length of time during the applicable six year limitations period preceding the filing of the instant action.[1] Although their duration of employment varied, their testimony showed that essentially every other detail of their employment with the Beverage Works was nearly identical. As delivery drivers, each Grievant worked five days per week for approximately twelve hours a day, totaling approximately sixty to sixty-five hours per week. Their daily routines each consisted of arriving at the Company's warehouse before 6:00 a.m., receiving a manifest that listed the location and address of each stop that they needed to make that day, carrying out the delivery of Red Bull to each vendor, and then returning to the warehouse upon completion of their routes. Grievants supported their testimony with documents reflecting that they indeed returned to the Company's warehouse at the end of their routes anywhere from around 5:00 p.m. until 6:30 p.m. The Grievants' testimony about the commencement time of their work day was supported by the Beverage Works' documents that showed warnings issued for failure to be at the warehouse by 6:00 a.m. Grievants further testified and produced documentary evidence that the Company paid them the same amount every week, which the Company calculated based on the Grievants' hourly rates multiplied by forty

---

[1] The Beverage Works argues that some Grievants are "barred by the two year Statute of Limitations under the FLSA." This is not true. Under the FLSA, the applicable Statute of Limitations is three years "if the employer knew that there was an appreciable possibility that it was covered by the Act and failed to take steps reasonably calculated to resolve the doubt." *McLaughlin v. Richland Shoe Co*,.486 U.S. 128, 136 (1988). Further, the Statute of Limitations for Grievants' NYLL claims is six years. *Pineda v. Masonry Const., Inc.,* 831 F. Supp. 2d 666, 682 (S.D.N.Y. 2011)

4

hours in a given week. Indeed, the evidence produced by the Grievants made it clear that the Beverage Works never paid any delivery drivers overtime hours for the entirety of their employment with the Company.

The Beverage Works does not dispute this. Instead, the Beverage Works bases its entire argument of denying Grievants their overtime pay on the Collective Bargaining Agreement ("CBA"). This argument that the Grievants contracted out of their FLSA protections is inherently flawed, as this dispute is not brought by the Grievants alleging violations of the CBA, but rather whether the Company's pay practices violated the FLSA. Indeed, the law is clear that wage violation disputes may be determined by arbitration, but the law is equally well-settled, long-held law that "FLSA rights cannot be abridged by contract or otherwise waived because it would nullify the purposes of the statute and thwart the legislative policies it was designed to effectuate." *Barrentine* v. *Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981) (internal quotations omitted); *Brooklyn Savings Bank v. O'Neill,* 324 U.S. 697,707 (1945).

Equally resolved is that an employer may not set a policy to prevent unauthorized overtime ours and then intentionally refuse to pay overtime rates in reliance on that policy. Rather, when an employer knows or has reason to know that overtime hours are being worked, it cannot stand idly by and then refuse to pay its employees the statutorily-required rates. *Forrester* v. *Roth's* 1. G. A. *Foodliner, Inc.,* 646 F.2d 413,414 (9th Cir. 1981). Rather, it must take all measures available to prevent the unwanted overtime work. *Chao v. Gotham Registry, Inc.,* 514 F.3d 280, 291 (2d Cir. 2008). The testimony by all parties and the documentary evidence produced shows that the Beverage Workers either knew, or reasonably should have known that the delivery Drivers' routes were taking longer than eight hours in a day.

In efforts to minimize its liability, the Beverage Works attempts to fall back on the argument that Grievants never in fact worked any overtime hours. Grievants, however, meet their burden to draw a reasonable inference that they worked more than forty

5

hours in a given week. Indeed, it is well-settled law that Grievants' estimates of their work hours based on their recollection **alone** is enough to shift the burden to the Company to show that it did in fact pay the Grievants for all hours worked at applicable rates. *Kuebel* v. *Black & Decker Inc.,* 643 F.3d 352, 362 (2d Cir. 2011) (collecting cases). As previously stated and further explained below, Grievants produced evidence to support their testimony that the Company gave them manifests with well over forty stops and produced "recap receipts" that show that they worked well past 6:00 p.m.

Accordingly, the burden clearly shifts to the Beverage Works, which has done absolutely nothing to rebut the Grievants' proof. Indeed, the Beverage Works glaringly failed to produce **ANY** documents whatsoever to support its supervisors' testimony that the delivery drivers "rarely" worked more than eight hours in a day. Undoubtedly, if these documents corroborated the testimony of the Beverage Works' supervisors, the Grievants' testimony would have been completely debunked. Obviously, the Beverage Works decided not to produce these documents because they supported the Grievants' testimony. The fact that the Beverage Works chose not to address this glaring hole in its argument both at arbitration and in its closing brief speaks volumes. Hiding its head in the sand does not make this evidentiary problem disappear.

Therefore, the Grievants should succeed in their arbitration dispute.

<u>COMPANY POSITION</u>

The Company's position was expressed in the Post arbitration brief dated June 26, 2013:

## UNDISPUTED FINDINGS OF FACT

1. Grievants are former employees of Beverage Works.
2. Grievants were delivery representatives (i.e., drivers).
3. While employed at Beverage Works, Grievants were members of the Local 713, IBOTU, IUJAT Union ("Union"), which is the exclusive bargaining unit for the

6

Former Employees as well as certain other Beverage Works employees.

4. Grievants' employment was governed by a negotiated agreement between Beverage Works and the Union ("CBA or "Agreement") as well The Beverage Works' Employee Handbook ("Employee Handbook") which is explicitly incorporated into and made a part of the CBA.

5. The CBA was "bargained collectively" and is mutually agreed "upon terms and conditions of employment under which the ... employees shall work."

6. The CBA "recognize[s] the unique position of the sales and delivery representative and its independence in performing its responsibilities." The CBA provides that sales and delivery representatives are salaried employees and that they shall be paid for completing their assigned route, which route is designed to be completed in an eight (8) hour day.

7. The minimum starting salary for a delivery representative is $25,000.00 and drivers also receive a bonus based upon the amount of product they deliver. (CBA and testimony of Jeffrey Brown)

8. The CBA further requires that if a route is taking more or less time to complete, "the employee will notify his supervisor and the supervisor, upon confirming the length of time will adjust the route up or down to ensure the route can be completed in eight (8) hours."

9. In addition, the CBA specifically incorporates the Employee Handbook into the CBA. The Handbook specifically requires drivers to notify Beverage Works **in writing** if his or her route takes more than eight (8) hours a day to complete.

10. Grievants' acknowledged receipt of the Employee Handbook in writing. (Grievants' testimony)

11. None of the Grievants' complained in writing to Beverage Works that their routes were taking more or less than eight (8) hours per day. (Grievants testimony)

12. Each Grievant admitted and that they never grieved the amount of time it took to complete their route or the compensation they received through their Union. (Grievants' testimony)

13. The Union has never brought an action alleging the Grievants were working

7

more than forty hours a week or were not compensated for all hours worked. (Undisputed Testimony of Beverage Works)

14. Chris Ustick, the Vice President of Sales, attended monthly meetings with the Union and the issue of drivers working in excess of eight (8) hours per day was never raised by the Union. (Undisputed testimony of Chris Ustick)

15. Mr. DiMario was initially employed as a driver and always completed his route within eight (8) hours, often completing forty to fifty stops on any given day. (Unrefuted testimony of Mr. DiMario)

16. Beverage Works has a sophisticated computer system which delivery stops are inputted into and a route is formulated. The list of stops appear in the suggested order that the deliveries should be completed as it is the most geographically efficient. However drivers are fee to deviate if they believe that there is a more efficient manner of completing the deliveries. (Unrefuted testimony of Ricardo Valentin)

17. Beverage Works receives orders for products from its sales force on a daily basis. Each day after the orders are entered, an individualized route is designed for each driver. Drivers are given deliveries in their assigned area. (Unrefuted testimony of Steve DiMario, Ricardo Valentin and Amaury Peralta)

18. Each route is designed on an individual basis taking into account a variety of considerations such as anticipated traffic conditions, type of entities the deliveries are going to, and is designed to be completed in eight (8) hours. (Unrefuted testimony of Jeffrey Brown, Steve DiMario, Ricardo Valentin and Amaury Peralta)

19. Each and every day the Beverage Works Operations Manager reviews the orders for a specific area and adjust routes up or down to insure that they can be completed in eight (8) hours. (Unrefuted testimony of Steve DiMario, Ricardo Valentin and Amaury Peralta)

20. On heavier days Beverage Works utilizes swing drivers to lighten routes and also assigns some drivers helpers to ensure that everyone works an eight (8) hour day. (Unrefuted testimony of Steve DiMario and Ricardo Valentin)

21. Beverage Works did not dictate the amount of time that Grievants could take for breaks, preclude stops by the Grievants for personal business, or monitor any deviations from completing the work during the course of the day. (Beverage Works representation and Grievants' testimony)

8

22. Each of the drivers that currently perform the routes held by the Grievants have given a sworn Affidavit stating that the route does not take more than eight (8) hours per day and he is aware that if there is a problem with the route, he is to report it to his supervisor. (Affidavits)

23. Grievant Hill complained that his route was too light. (Unrefuted testimony of Steve DiMario and Mr. Hill)

24. The time period in which Beverage Works sought to have Grievants back was approximately 1:00 p.m. (Unrefuted testimony of Steve DiMario)

25. It would be problematic if beverage Works drivers were coming back at 4:00 and 5:00 in the afternoon, because it would negatively impact on the next day. The goal is to have drivers back by 1:00 p.m. to start getting ready for the next day's deliveries. Beverage Works would want to see what deliveries were not completed (pushed) and needed to be re-routed the next day. The Operations Manager would want to begin formulating the routes based upon the current orders and the pushed deliveries. In addition, Beverage Works would want to begin unloading and loading the trucks for the next day. (Unrefuted testimony of Ricardo Valentin and Steve DiMario)

All of the foregoing, is undisputed on this record. Here there is no question that Beverage Works NY, Inc., fully complied with the express and negotiated terms of the Collective Bargaining Agreement ("CBA") and has fully compensated each of the Grievants in accordance with the provisions of the Collective Bargaining Agreement and all applicable laws.

DISCUSSION AND AWARD

As the moving party the burden of proof is on the grievant to satisfy the undersigned that Samuel Soto-Torres is entitled to the $114,250.00[2] in unpaid overtime and liquidated damages as claimed. In the opinion of the undersigned this burden has not been met. His basic contention was that from January 2010 until April 2012 he worked at least 12 hours a day. This testimony was found to be incredible. For an employee working in a union environment who by his own testimony was hired to work at the most

---

[2] Statement of Damages Samuel Soto-Torres

9

40 hours a week for a specific amount of money would just accept these ridiculous working hours (62.5) as a given is hard to swallow.

Mr. Torres-Soto testified that he joined the Company in April 2012 as a Merchandiser and was supposed to be an hourly employee. He had no paystubs to enter into evidence but the Company did not dispute that he was paid the same amount every week as the other Grievants. When he did not receive overtime pay he claims to have approached his supervisor and he responded that "he was working on it" or "there was nothing he could do". It should be noted that his fellow Grievant Leonard Reyes also worked as a Merchandiser and testified that as such he did not exceed 8 hours per day. It is not clear that this is a union position but even if it weren't what prudent may who claims to have been hired as an hourly employee would accept a check that did not reflect his just due. In any event there were no paystubs for this grievant offered into evidence.

It should be noted that during cross examination the Company Advocate asked, "When you were a Merchandiser you were basically given a manifest and told to complete it... umm which was, did you understand it they anticipated it to be completed within an 8 hour time period?" Without hesitation the Grievant answered, "Yes. They would give us a list of stores and whatever we could complete in those amount of hours that's what we would do." The Advocate then asked, "If it were not completed it would be left for another day." He responded, "It would rollover to the next day." There is no reason to believe that Mr. Torres-Soto was treated any differently than Mr. Reyes and there certainly was no offer of proof to support same.

Mr. Torres-Soto testified that in January 2011 he became a Delivery Driver but no one told him it was a salaried position. He claimed he was still receiving the same amount of money on his paystub so he assumed he still was an hourly employee. This despite the fact he was not being paid for the hours he worked on an overtime basis...incredible.

He was the only driver however to indicate at first that the general day was only 30 stops. After continued pressing by his counsel, "What was it on the high end?", he

10

upped the number to 40. He continued with, "Was it ever more than 40?" and the Grievant responded, "Yes." He was the sole hold out in that he denied he was ever told his routes should be completed in eight hours. Again it is incredible that he was the only driver not to realize the routes were designed to be finished in 8 hours.

When asked, "Did anyone tell you there was a change in pay status when you switched from Merchandiser to Delivery person?, he responded "Yes." He then indicated that Amaury Peralta told him about the commission. It is hard to believe that if Mr. Peralta discussed commission he didn't talk about the other aspects of the position. He echoed his fellow Grievants in that he always returned between 5:00 – 6:00pm.

It should be noted that of all the Grievants, Mr. Torres-Soto cannot deny he availed himself of the Union. He claimed he was suspended for "asking for help" and was "out" for a week and returned after Union intervention on a probation period. As a point of fact Mr. Brown as a rebuttal witness submitted evidence that showed Mr. Torres-Soto was terminated[3] for lying, falsifying data and failure to follow proper procedures for push/refusals. The Union intervened and got him his job back with a 90 day probation. This begs the question of why wouldn't a person who was being worked beyond the terms and conditions of the cba not file a grievance!

The grievant's representative suggests that a Company "cannot stand idly by..."[4] and ", it must take all measures available to prevent the unwanted overtime work."[5] Clearly the Company did not stand idly by and in fact required employees to put in writing if a route took too long[6] but that was clearly a CYA. As a point of fact through credible testimony of several Company witnesses the process of adjusting routes to be completed within 8 hours was explained with the recognition that it was in the Company's best interest to have the drivers back by 2:00pm and that in many cases they came in as early as 12:30pm. Any adjustments required were effected the next day.

---

[3] Beverage Works letter dated January 27, 2012
[4] Grievants' Post Arbitration Brief pg 2
[5] Grievant's Post arbitration Brief pg 2
[6] Pg 16 Beverage Works Handbook dated 2011

11

Christopher Ustich, Vice President, testified that the Company did not closely monitor the drivers on their routes to determine how much personal time is taken including breaks and lunch and as a result depended on driver feedback to insure the routes were finished within 8 hours. He indicated that in his position he attended meetings at least bimonthly with the Union and problems with route completion within the allotted time were never raised. He pointed out that the Company has a complaint box and he has an open door policy in addition to attending driver and team meetings on a regular basis any of which could be used to challenge route length. According to him prior to this law suit there had been no unresolved issues with excessive route stops.

Steven DiMario, Operations Director, an eleven year employee of the Company, testified that he formulated the routes on a daily basis from 2011 - 2013. He explained that they were formulated on an individual basis using various factors such as case load, stop amount and driver efficiency. He credibly testified that as issues were raised he would adjust the routes the next day. He described how on occasion he would lighten a route for vacation or personal reasons. He remembers adjusting Mr. Torres-Soto was treed any differently than Mr. Reyes difficulty.

He mentioned that he had occasion to attend drivers meeting but never encountered any hue and cry over route completion. When issues were raised the routes were tweaked before the next day. He confirmed that the Company did not monitor the drivers. He added that when he was in Brooklyn he physically observed most drivers were back by 2:00pm and it was not unusual on a Monday that most were back by 12:30pm.

Jeff Brown, V.P. Operations, testified that he has been with the Company for 13 years and started out as a Driver receiving a salary. When asked did he complete his routes in 8 hours he responded, "No.. 6 hours." He rebutted the suggestion of the grievant's attorney that the language in the Employee Handbook[7] regarding overtime applied to the drivers and confirmed that it only applied to hourly employees. He confirmed the

---

[7] Beverage Works Employee Handbook IX pg 12 pg 12

12

responsibility of the driver to report route problems in order to have the routes finished within 8 hours. He indicated that the new UPS program utilized by the Company is extremely efficient in setting up routes.

Amaury Peralta, Sales Manager, and Company employee for 12 years also testified that he had been a Driver/Seller before his current position and always completed his routes in 8 hours or less. He described his familiarity with the routes and added he provided daily feedback to the routers including Steve DiMario in order to tweak routes when required. He indicated that he followed up with whoever brought the issue to his attention. He credibly testified that when contacted by a driver he would review the stops and advise him accordingly. He might indicate which stops to complete and or push for delivery next day. He indicated that the divers for the most part would return between 1 and 2pm.

He recounted occasions during the driver meetings when the issue of route length was raised. He claimed to have met with the driver after to discuss the issue and coordinated with Steve or the individual routing and tweak it immediately. Occasionally a helper would be provided which would allow delivery in difficult parking areas (the truck could keep circling or double park) as well as help unloading cases.  He rebutted the Grievants' claim that supervisors including him were readily available to insure customer satisfaction.

The final witness for the Company was Ricardo Valentin, Operations Manager. He indicated that prior to taking that position had been employed as a driver and completed his rotes in 8 hours or less. He stated the Company now used a sophisticated routing program developed by UPS but this did not result in any major differences in route compilation. The factors used paralleled the other Operations Manager in that he took into consideration traffic, accounts and the driver. He confirmed all previous testimony that route concerns were addressed immediately when possible and no later than the next day if necessary. The Company through this witness offered into evidence affidavits of the current drivers performing the grievant's route. The affidavits were accepted "For what they are worth." based on the Best Evidence objection of the

13

Grievant's counsel. As appoint of fact the undersigned gave little consideration to these documents in that several of the Company's earlier witnesses including Mr. Peralta established that they had completed their routes in 8 hours or less.

After weighing all the evidence and testimony the undersigned finds that the Grievant did not meet the burden of proof that he worked approximately 25 to 30 hours per week for his entire employment at the Company. His credibility is suspect at best in light of the testimony of a fellow witness' account of working as a Merchandiser[8]. There was also unrebutted testimony that Monday was "light day" and most drivers were in by 12:30pm. There was no way that the claim by the Grievant could be considered anything but frivolous. This matter would have been better served had they all filed a grievance. The issue could have been disposed of in the moment with timely records and Requests For Information. In the opinion of the undersigned all these grievances are stale at best with no substantive proof and a lack of credibility from the Grievants.

It does not make sense that a prudent person working in a union environment would agree to work 60 to 70 hours per week for the same amount paid for 40 hours per week. If it doesn't make sense it is not true. The Company had a system in place which worked for the Company officials that had been drivers. In the instant grievance although claiming to have worked 25 to 30 hours each and every week there is nothing to even raise an eyebrow over. The testimony of the grievant is totally unreliable.

For the above mentioned reasons this grievance is denied in its entirety.

Wellington J. Davis, Jr.

On this 25th day of July 2015,

_____

[8] Leonard Reyes testified that as a Merchandiser he only worked 8 hours a day.

14

before me personally appeared    *Wellington J. Davis, Jr* known to

be the individual described in and who executed the foregoing instrument, and he

acknowledged to me that he/she executed same

STATE OF NEW JERSEY

COUNTY OF MONMOUTH

SIGNATURE OF NOTARY    *Patricia Davis*

MY COMMISION EXPIRES

PATRICIA DAVIS
ID # 2286732
NOTARY PUBLIC
STATE OF NEW JERSEY
My Commission Expires April 18, 2017

# EXHIBIT

# H

```
*   *   *   *   *   *   *   *

                            *

In the Matter of the Arbitration    *

        Between                     *

Leonard Reyes,                      *

        Grievant                    *

                                    *

        And                         *

                                    *

The Beverage Works NY, Inc.,        *

and Ricardo Valentin,               *

        Employer,                   *

*   *   *   *   *   *   *   *   *
```

BEFORE: Wellington J. Davis, Jr. Panel Arbitrator

APPEARANCES:

    For the Company:  Susan Burns, Esq.

                                  Ricardo Valentin

                                  Amaury Peralta

                                  Jeffery C. Brown

                                  Christopher Ustich

                                  Stephen DiMario

    For the Grievants:  Jeffrey Maguire, Esq.

                                  Jonathan Hill

2

Edwin Pacheco

Efrain Rodriquez

Nicholas V. Jones

Ricardo Valentin

Place of Hearing:    Newark, NJ

Dates of Hearing:    May 7, 2015

Date of Award:    July 20, 2015

As the panel arbitrator for the Beverage Works the undersigned was designated by the parties to hear and determine the following issue:

"Was the overtime allegedly worked by the grievant "suffered or permitted" within the meaning of the collective bargaining agreement or applicable regulations? If so what shall the remedy be?"

A hearing was held on May 7, 2015 in the offices of the New Jersey State Board of Mediation located at Two gateway Center Newark, NJ. At this time the parties were afforded full opportunity to present witnesses, documentary evidence and oral arguments in support of their respective positions. The parties requested to submit closing briefs on the other Grievants and the hearings were closed on June 26, 2015.

GRIEVANT'S POSITION

The position of the grievant was expressed in the Post Arbitration Brief dated July 2, 2015:

The Grievants, Edwin Pacheco, Jonathan Hill, Samuel Soto, Efrain Rodriguez, Lenny Reyes and Darnell Brunston ("Grievants"), by and through their attorneys, submit this legal brief as a closing statement in support of their arguments made during arbitration concerning violations of the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL"). The Grievants, former delivery drivers belonging to Local 713, IBOTU, IUJAT Union ("Union"), bring this action against Beverage Works, Inc. ("the Beverage Works" or "the Company"), alleging that the Company failed to pay its delivery drivers

3

statutorily-required overtime pay for all hours worked exceeding forty in a given workweek.

During the course of the two-day arbitration, the Grievants each provided independent testimony that they worked as delivery drivers for some length of time during the applicable six year limitations period preceding the filing of the instant action.[1] Although their duration of employment varied, their testimony showed that essentially every other detail of their employment with the Beverage Works was nearly identical. As delivery drivers, each Grievant worked five days per week for approximately twelve hours a day, totaling approximately sixty to sixty-five hours per week. Their daily routines each consisted of arriving at the Company's warehouse before 6:00 a.m., receiving a manifest that listed the location and address of each stop that they needed to make that day, carrying out the delivery of Red Bull to each vendor, and then returning to the warehouse upon completion of their routes. Grievants supported their testimony with documents reflecting that they indeed returned to the Company's warehouse at the end of their routes anywhere from around 5:00 p.m. unti16:30 p.m. The Grievants' testimony about the commencement time of their work day was supported by the Beverage Works' documents that showed warnings issued for failure to be at the warehouse by 6:00 a.m. Grievants further testified and produced documentary evidence that the Company paid them the same amount every week, which the Company calculated based on the Grievants' hourly rates multiplied by forty hours in a given week. Indeed, the evidence produced by the Grievants made it clear that the Beverage Works never paid any delivery drivers overtime hours for the entirety of their employment with the Company.

The Beverage Works does not dispute this. Instead, the Beverage Works bases

---

[1] The Beverage Works argues that some Grievants are "barred by the two year Statute of Limitations under the FLSA." This is not true. Under the FLSA, the applicable Statute of Limitations is three years "if the employer knew that there was an appreciable possibility that it was covered by the Act and failed to take steps reasonably calculated to resolve the doubt." *McLaughlin v. Richland Shoe Co,*.486 U.S. 128, 136 (1988). Further, the Statute of Limitations for Grievants' NYLL claims is six years. *Pineda v. Masonry Const., Inc.,* 831 F. Supp. 2d 666, 682 (S.D.N.Y. 2011)

4

its underline entire argument of denying Grievants their overtime pay on the Collective Bargaining Agreement ("CBA"). This argument that the Grievants contracted out of their FLSA protections is inherently flawed, as this dispute is not brought by the Grievants alleging violations of the CBA, but rather whether the Company's pay practices violated the FLSA. Indeed, the law is clear that wage violation disputes may be determined by arbitration, but the law is equally well-settled, long-held law that "FLSA rights cannot be abridged by contract or otherwise waived because it would nullify the purposes of the statute and thwart the legislative policies it was designed to effectuate." *Barrentine* v. *Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981) (internal quotations omitted); *Brooklyn Savings Bank v. O'Neill*, 324 U.S. 697,707 (1945).

Equally resolved is that an employer may not set a policy to prevent unauthorized overtime ours and then intentionally refuse to pay overtime rates in reliance on that policy. Rather, when an employer knows or has reason to know that overtime hours are being worked, it cannot stand idly by and then refuse to pay its employees the statutorily-required rates. *Forrester* v. *Roth's 1. G. A. Foodliner, Inc.*, 646 F.2d 413,414 (9th Cir. 1981). Rather, it must take all measures available to prevent the unwanted overtime work. *Chao* v. *Gotham Registry, Inc.*, 514 F.3d 280, 291 (2d Cir. 2008). The testimony by all parties and the documentary evidence produced shows that the Beverage Workers either knew, or reasonably should have known that the delivery Drivers' routes were taking longer than eight hours in a day.

In efforts to minimize its liability, the Beverage Works attempts to fall back on the argument that Grievants never in fact worked any overtime hours. Grievants, however, meet their burden to draw a reasonable inference that they worked more than forty hours in a given week. Indeed, it is well-settled law that Grievants' estimates of their work hours based on their recollection **alone** is enough to shift the burden to the Company to show that it did in fact pay the Grievants for all hours worked at applicable rates. *Kuebel* v. *Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011) (collecting

5

cases). As previously stated and further explained below, Grievants produced evidence to support their testimony that the Company gave them manifests with well over forty stops and produced "recap receipts" that show that they worked well past 6:00 p.m.

Accordingly, the burden clearly shifts to the Beverage Works, which has done absolutely nothing to rebut the Grievants' proof. Indeed, the Beverage Works glaringly failed to produce **ANY** documents whatsoever to support its supervisors' testimony that the delivery drivers "rarely" worked more than eight hours in a day. Undoubtedly, if these documents corroborated the testimony of the Beverage Works' supervisors, the Grievants' testimony would have been completely debunked. Obviously, the Beverage Works decided not to produce these documents because they supported the Grievants' testimony. The fact that the Beverage Works chose not to address this glaring hole in its argument both at arbitration and in its closing brief speaks volumes. Hiding its head in the sand does not make this evidentiary problem disappear.

Therefore, the Grievants should succeed in their arbitration dispute.

<u>COMPANY POSITION</u>

The Company's position was expressed in the Post arbitration brief dated June 26, 2013:

UNDISPUTED FINDINGS OF FACT

1. Grievants are former employees of Beverage Works.

2. Grievants were delivery representatives (i.e., drivers).

3. While employed at Beverage Works, Grievants were members of the Local 713, IBOTU, IUJAT Union ("Union"), which is the exclusive bargaining unit for the Former Employees as well as certain other Beverage Works employees.

4. Grievants' employment was governed by a negotiated agreement between Beverage Works and the Union ("CBA or "Agreement") as well The Beverage Works' Employee Handbook ("Employee Handbook") which is explicitly

6

incorporated into and made a part of the CBA.

5. The CBA was "bargained collectively" and is mutually agreed "upon terms and conditions of employment under which the ... employees shall work."

6. The CBA "recognize[s] the unique position of the sales and delivery representative and its independence in performing its responsibilities." The CBA provides that sales and delivery representatives are salaried employees and that they shall be paid for completing their assigned route, which route is designed to be completed in an eight (8) hour day.

7. The minimum starting salary for a delivery representative is $25,000.00 and drivers also receive a bonus based upon the amount of product they deliver. (CBA and testimony of Jeffrey Brown)

8. The CBA further requires that if a route is taking more or less time to complete, "the employee will notify his supervisor and the supervisor, upon confirming the length of time will adjust the route up or down to ensure the route can be completed in eight (8) hours."

9. In addition, the CBA specifically incorporates the Employee Handbook into the CBA. The Handbook specifically requires drivers to notify Beverage Works **in writing** if his or her route takes more than eight (8) hours a day to complete.

10. Grievants' acknowledged receipt of the Employee Handbook in writing. (Grievants' testimony)

11. None of the Grievants' complained in writing to Beverage Works that their routes were taking more or less than eight (8) hours per day. (Grievants testimony)

12. Each Grievant admitted and that they never grieved the amount of time it took to complete their route or the compensation they received through their Union. (Grievants' testimony)

13. The Union has never brought an action alleging the Grievants were working more than forty hours a week or were not compensated for all hours worked. (Undisputed Testimony of Beverage Works)

14. Chris Ustick, the Vice President of Sales, attended monthly meetings with the Union and the issue of drivers working in excess of eight (8) hours per day was never raised by the Union. (Undisputed testimony of Chris Ustick)

7

15. Mr. DiMario was initially employed as a driver and always completed his route within eight (8) hours, often completing forty to fifty stops on any given day. (Unrefuted testimony of Mr. DiMario)

16. Beverage Works has a sophisticated computer system which delivery stops are inputted into and a route is formulated. The list of stops appear in the suggested order that the deliveries should be completed as it is the most geographically efficient. However drivers are fee to deviate if they believe that there is a more efficient manner of completing the deliveries. (Unrefuted testimony of Ricardo Valentin)

17. Beverage Works receives orders for products from its sales force on a daily basis. Each day after the orders are entered, an individualized route is designed for each driver. Drivers are given deliveries in their assigned area. (Unrefuted testimony of Steve DiMario, Ricardo Valentin and Amaury Peralta)

18. Each route is designed on an individual basis taking into account a variety of considerations such as anticipated traffic conditions, type of entities the deliveries are going to, and is designed to be completed in eight (8) hours. (Unrefuted testimony of Jeffrey Brown, Steve DiMario, Ricardo Valentin and Amaury Peralta)

19. Each and every day the Beverage Works Operations Manager reviews the orders for a specific area and adjust routes up or down to insure that they can be completed in eight (8) hours. (Unrefuted testimony of Steve DiMario, Ricardo Valentin and Amaury Peralta)

20. On heavier days Beverage Works utilizes swing drivers to lighten routes and also assigns some drivers helpers to ensure that everyone works an eight (8) hour day. (Unrefuted testimony of Steve DiMario and Ricardo Valentin)

21. Beverage Works did not dictate the amount of time that Grievants could take for breaks, preclude stops by the Grievants for personal business, or monitor any deviations from completing the work during the course of the day. (Beverage Works representation and Grievants' testimony)

22. Each of the drivers that currently perform the routes held by the Grievants have given a sworn Affidavit stating that the route does not take more than eight (8) hours per day and he is aware that if there is a problem with the route, he is to report it to his supervisor. (Affidavits)

23. Grievant Hill complained that his route was too light. (Unrefuted testimony of Steve

8

DiMario and Mr. Hill)

24. The time period in which Beverage Works sought to have Grievants back was approximately 1 :00 p.m. (Unrefuted testimony of Steve DiMario)

25. It would be problematic if beverage Works drivers were coming back at 4:00 and 5:00 in the afternoon, because it would negatively impact on the next day. The goal is to have drivers back by 1:00 p.m. to start getting ready for the next day's deliveries. Beverage Works would want to see what deliveries were not completed (pushed) and needed to be re-routed the next day. The Operations Manager would want to begin formulating the routes based upon the current orders and the pushed deliveries. In addition, Beverage Works would want to begin unloading and loading the trucks for the next day. (Unrefuted testimony of Ricardo Valentin and Steve DiMario)

All of the foregoing, is undisputed on this record. Here there is no question that Beverage Works NY, Inc., fully complied with the express and negotiated terms of the Collective Bargaining Agreement ("CBA") and has fully compensated each of the Grievants in accordance with the provisions of the Collective Bargaining Agreement and all applicable laws.

DISCUSSION AND AWARD

As the moving party the burden of proof is on the grievant to satisfy the undersigned that Leonard Reyes is entitled to $100, 906.00 in alleged unpaid overtime and liquidated damages[2]. In the opinion of the undersigned this burden has not been met. His Statement of Damages claims that from July 2012 until November 2013 he worked 65 hours per week. This was found to be incredible. For an employee working in a union environment who by his own testimony was hired to work at the most 40 hours a week for a specific amount of money would just accept these ridiculous working hours (65) as a given is hard to swallow.

In addition during direct testimony he stated that he did not exceed 40 hours while working in the positions he held after his stint as a driver, "I became a Merchandiser in

---

[2] Statement of Damages Lenny Reyes

9

January 2013 and then a salesman". When asked ,did you exceed 40 hours in those positions, he responded, "No." This point was raised under cross and yet there was no effort to even amend the demand not even in the Post Arbitration Brief. It appears the Grievants are throwing their testimony and evidence against the wall to see what sticks.

Mr. Reyes testified that he was initially hired as a Driver in 2012 and upon his request was moved to a Merchandiser position in January 2013. He indicated that he recognized that as a driver he was designated as a salaried employee and was expected to complete his route within 8 hours. A prudent person might ask why someone who was subjected to work ungodly unpaid overtime would want to continue working for the Company. He claims that as a driver he worked Monday through Friday starting between 5:30 and 6:00 am. He was the only grievant to provide documentation[3] which indicates that he was present at the Company at 5:03pm on 10/11/12 and 6:28 pm 11/08/12 but as pointed out by the Company it does not confirm a start time.

The Advocate for the Grievants suggests that these two incidents plus a few manifests with over 40 stops and the incredible testimony of the Grievants proves that they worked overtime for almost 4,000 hours[4]. He also suggests that the Company witnesses accepted that as proof when in fact when asked about the receipts each Company witness, although acknowledging the time, pointed out that the late arrivals may have been due to break downs.

Under cross examination he claimed he complained to the shop steward as well as at the biweekly driver meetings but to no avail. In other words although hired to work 40 hours per week in a union protected job he claims to have worked up to almost twice the hours for the same weekly salary. It does not make sense and if it doesn't make sense it is not true.

Mr. Reyes did not contract away his right to overtime but rather accepted a position identified in the cba as salaried. There was no evidence or testimony offered to suggest

---

[3] Handheld :70 Driver Lenny Reyes 10/10.12 and 11/08/12
[4] Statement of Damages total 766 weeks x 5 days = 3,830

10

that salaried employees cannot be covered by a collective bargaining agreement.

The grievant's representative suggests that a Company "cannot stand idly by…"[5] and ", it must take all measures available to prevent the unwanted overtime work."[6] Clearly the Company did not stand idly by and in fact required employees to put in writing if a route took too long[7] but that was clearly a CYA. As a point of fact through credible testimony of several Company witnesses the process of adjusting routes to be completed within 8 hours was explained with the recognition that it was in the Company's best interest to have the drivers back by 2:00pm and that in many cases they came in as early as 12:30pm. Any adjustments required were effected the next day.

Christopher Ustich, Vice President, testified that the Company did not closely monitor the drivers on their routes to determine how much personal time is taken including breaks and lunch and as a result depended on driver feedback to insure the routes were finished within 8 hours. He indicated that in his position he attended meetings at least bimonthly with the Union and problems with route completion within the allotted time were never raised. He pointed out that the Company has a complaint box and he has an open door policy in addition to attending driver and team meetings on a regular basis any of which could be used to challenge route length. According to him prior to this law suit there had been no unresolved issues with excessive route stops.

Steven DiMario, Operations Director, an eleven year employee of the Company, testified that he formulated the routes on a daily basis from 2011 - 2013. He explained that they were formulated on an individual basis using various factors such as case load, stop amount and driver efficiency. He credibly testified that as issues were raised he would adjust the routes the next day. He described how on occasion he would lighten a route for vacation or personal reasons. He indicated that the Company employed swing drivers and helpers to assist the regular drivers who were experiencing difficulty.

---

[5] Grievants' Post Arbitration Brief pg 2
[6] Grievant's Post arbitration Brief pg 2
[7] Pg 16 Beverage Works Handbook dated 2011

11

He mentioned that he had occasion to attend drivers meeting but never encountered any hue and cry over route completion. When issues were raised the routes were tweaked before the next day. He confirmed that the Company did not monitor the drivers. He added that when he was in Brooklyn he physically observed most drivers were back by 2:00pm and it was not unusual on a Monday that most were back by 12:30pm.

Jeff Brown, V.P. Operations, testified that he has been with the Company for 13 years and started out as a Driver receiving a salary. When asked did he complete his routes in 8 hours he responded, "No... 6 hours." He rebutted the suggestion of the grievant's attorney that the language in the Employee Handbook[8] regarding overtime applied to the drivers and confirmed that it only applied to hourly employees. He confirmed the responsibility of the driver to report route problems in order to have the routes finished within 8 hours. He indicated that the Company now uses a UPS program which is extremely efficient in setting up routes.

Amaury Peralta, Sales Manager, and Company employee for 12 years also testified that he had been a Driver/Seller before his current position and always completed his routes in 8 hours or less. He described his familiarity with the routes and added he provided daily feedback to the routers including Steve DiMario in order to tweak routes when required. He indicated that he followed up with whoever brought the issue to his attention. He credibly testified that when contacted by a driver he would review the stops and advise him accordingly. He might indicate which stops to complete and or push for delivery next day. He indicated that the divers for the most part would return between 1 and 2pm.

He recounted occasions during the driver meetings when the issue of route length was raised. He claimed to have met with the driver after to discuss the issue and coordinated with Steve or the individual routing and tweak it immediately. Occasionally a helper would be provided which would allow delivery in difficult parking areas (the

---

[8] Beverage Works Employee Handbook IX pg 12 pg 12

12

truck could keep circling or double park) as well as help unloading cases. He rebutted the Grievants' claim that supervisors including him were not readily available.

The final witness for the Company was Ricardo Valentin, Operations Manager. He indicated that prior to taking that position had been employed as a driver and completed his rotes in 8 hours or less. He stated the Company now used a sophisticated routing program developed by UPS but this did not result in any major differences in route compilation. The factors used in route preparation paralleled the other Operations Manager's methodology in that he took into consideration traffic, accounts and the driver. He confirmed all previous testimony that route concerns were addressed immediately when possible and no later than the next day if necessary. The Company through this witness offered into evidence affidavits of the current drivers performing the grievant's route. The affidavits were accepted "For what they are worth." based on the Best Evidence objection of the Grievant's counsel. As appoint of fact the undersigned gave little consideration to these documents in that several of the Company's earlier witnesses, including Mr. Peralta, established that they had completed their routes in 8 hours or less.

After weighing all the evidence and testimony the undersigned finds that the Grievant did not meet the burden of proof that he worked approximately 25 to 30 hours per week beyond his 40 hour week for his entire employment at the Company. As indicated above he admitted that from the time he became a Merchandiser in January 2013 he did not work over 40 hours. It does not make sense that a prudent person working in a union environment would agree to work 60 to 70 hours per week for any length of time for the same amount paid for 40 hours per week. If it doesn't make sense it is not true. The testimony of the grievant in support of his claim is totally unreliable.

For the above mentioned reasons this grievance is denied in its entirety.

Wellington J. Davis, Jr.

13

On this 25th day of July 2015,

before me personally appeared _Wellington J. Davis, Jr_ known to

be the individual described in and who executed the foregoing instrument, and he

acknowledged to me that he/she executed same

STATE OF NEW JERSEY

COUNTY OF MONMOUTH

SIGNATURE OF NOTARY _Patricia Davis_

MY COMMISION EXPIRES

PATRICIA DAVIS
ID # 2286732
NOTARY PUBLIC
STATE OF NEW JERSEY
My Commission Expires April 18, 2017